## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

**JOHN COE,**

     **Plaintiff,**

**v.**                                                                          **Case No.**

**RHODES COLLEGE,**

     **Defendant.**

---

### COMPLAINT

---

Comes now John Coe ("Plaintiff" or "John Coe") and brings this Complaint alleging discrimination on the basis of gender against Defendant Rhodes College ("Defendant" or "Rhodes College") for violation of Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681 et seq. and for breach of contract.  In support of his Complaint, Plaintiff states as follows:

### PARTIES

1.    Plaintiff John Coe is an adult male resident of Florida and former student at Rhodes College.

2.    Plaintiff seeks leave to proceed under a pseudonym due to fear of personal embarrassment, humiliation, and psychological trauma.[1] Specifically, Plaintiff has been falsely

---

[1]    Plaintiff has chosen to proceed under the pseudonym "John Coe" instead of the more typical "John Doe" to avoid confusion with another lawsuit recently filed against the same Defendant by a party using the latter pseudonym.  See Doe v. Rhodes College, Case No. 19-2336 (W.D. Tenn.).

accused of acts that, if true, would constitute sexual assault. No criminal charges have been brought against Plaintiff. The harm to Plaintiff would be compounded by the publication of his identity.

3.      Defendant Rhodes College is a Tennessee nonprofit corporation with its principle place of business located at 2000 N. Parkway, Memphis, TN 38112.  Rhodes College is a private, liberal arts residential college with approximately 2000 students enrolled each year.  Rhodes College accepts federal funding from the United States Department of Education and is thus subject to Title IX.

## JURISDICTION

4.      This Court has jurisdiction over Plaintiff's claims brought under 20 U.S.C. §§ 1681 et seq. pursuant to 28 U.S.C. § 1331.  Venue is proper as the actions contained within this Complaint occurred within the Western District of Tennessee.

## STATEMENT OF FACTS

5.      Plaintiff is a male student at Rhodes College who going into the Spring semester of the 2018-2019 academic year took a leave of absence with a plan to return to classes in the fall and graduate by December 2019.  During his leave of absence, Plaintiff was working at a local restaurant.

6.      On or about February 14, 2019, after finishing his shift at work at approximately 10:00 p.m., Plaintiff left work and went to the Sigma Alpha Epsilon ("SAE") fraternity house on Rhodes College's campus.  SAE was hosting a Valentine's Day event.  Plaintiff was not a member of SAE, but was friends with a number of members including ███.

7.      ███ was attending the event with his date, ███., who is a female student at Rhodes.

8.      Also in attendance at the event was a freshman female student, ███.

9.      During the course of the evening ▆ consumed a large quantity of alcohol, smoked marijuana, and used cocaine. In the later part of the evening, ▆ and ▆ came up to an attic room, which was only accessible by a ladder and where Plaintiff had been hanging out with a group including ▆., ▆., and a couple of others.  At around the same time as ▆. and ▆. came to the room ▆ and her date ▆ also came to the upstairs room.

10.     ▆ then became violently ill. Plaintiff, ▆, ▆, and four members of the SAE fraternity undertook to ensure that Plaintiff was not in danger. ▆ provided ▆ a container in which to vomit, ensured that she was lying on her stomach on a chair so that she did not asphyxiate, and attempted to persuade her to drink water. ▆ texted ▆' friend, ▆., to come and pick her up.  Plaintiff shortly thereafter called ▆ and told her that ▆ was not doing well and asked ▆ to come and help with her.

11.     Upon ▆'s arrival, ▆ proved unable to get to her friends' vehicle on her own. ▆ asked ▆ to carry her. Once she reached the bottom of the ladder, ▆. assisted her to the vehicle. During the entire relevant period, ▆ was incapacitated, in-and-out of consciousness, refusing to drink water, and speaking incoherently.

12.     When ▆ arrived, she found ▆ with Plaintiff, exactly where Plaintiff told ▆ that he and ▆ were. ▆ was lying across three chairs with her head over a bucket. ▆ reports that she was fully clothed.

13.     ▆ was not alone with anyone at any point in time with the brief exception that she was alone with ▆ for approximately five minutes after ▆ and Plaintiff contacted ▆' friends. ▆ spent the majority of the evening surrounded by as many as nine (9) people.  Plaintiff was only ever in ▆'s presence when at least two other people were also in the room.

14. All of the individuals, both male and female, who observed █████ at the event later gave statements or testified that ████ had been intoxicated to the point of incapacity, that several individuals attempted to provide her assistance and care, that, with the brief exception outlined above, she was never left alone, and that she was usually in a large group and in mixed company. All individuals present testified that no one touched her inappropriately at any point.

15. ████ only remembers "bits and pieces" of the evening and was "unable to comprehend" what was happening around her. ████ believes that someone had anal sex with her. She has stated that she has no recollection as to who did this to her.

16. When ████ arrived, ████ stated "They raped me." ████ was incoherent and incapacitated.

17. ████ stated that she wanted to go to the hospital. Upon arrival at the hospital, ████ changed her mind and requested that they go home. ████ advised ████' roommate ██. that ██. was raped.

18. After returning to their house, ████ and ███ proceeded to interrogate ███ in her intoxicated state. ███ remembers being questioned but not the questions. ███ and ███ asked ████

19. The Title IX investigative report states, in pertinent part:

Witness (████) stated ███ was very non-responsive but Witness wasn't worried about alcohol poisoning. Witness stated ██. was very subdued and lacked energy. Witness stated ██'s eyes were closed but **she could move one arm instead of speaking.** Witness stated that she and [another female student] asked ███ what happened and started using yes or no questions. Witness stated they started listed (sic) questions to figure out who raped her, i.e. was it a freshman, sophomore, junior, etc. Witness stated ███ gave a thumbs up to it being a senior. Witness stated she asked was it ███, and ███ gave a thumbs up. Witness stated she asked was it ███, and ███ again gave a thumbs up. Witness stated that when asked about anyone else, ███ motioned that she was unsure. (emphasis added)

20. ████ also reported that "Witness stated that they asked ███ if the guys had sex with her and ███ gave a thumbs down."

21.     ███ also wrote down the first four letters of ███ 's first name on a piece of paper provided by another female student. Witness stated that she asked whether she was referring to "███" ███ again "gave a thumbs up" in reference to ███.

22.     ███ then stated "[███] is not ok," and "she is not a good person," and then stated "she made it all happen."

23.     ███, another of ███' roommates, gave a statement that the night of the alleged incident that she and ███ interrogated ███ by asking her leading questions naming specific individuals including ███ and Plaintiff to which ███ "gave a thumbs up."

24.     ███ gave a statement in which she said ███ reported "[███] is bad, and ███ said [███] is the one that told them to do it and that it wouldn't have happened without her. Witness stated ███ was actually able to articulate this."

25.     The next morning, ███ reported that ███ said "she thinks she was raped but she doesn't know if she's misremembering." ███ then told ███ that "she was adamant that she was raped the night before."

26.     ███. stated that "███ [was] still trying to remember what happened and is unclear."

27.     ███. stated that "it felt like something must have happened."

28.     ███. took ███. to the hospital. ███. then went into the hospital with ███. ███. requested that ███. leave the room. ███. was administered an examination and rape kit.

29.     Hospital personnel, following protocol, contacted Memphis Police Department, who took ███. to the Rape Crisis Center. A group of ███' friends accompanied her.

30.     ███ and her friends were interviewed by a detective and gave statements to the sex crimes unit.

31.      Another of ▮▮▮▮' roommates, ▮▮▮▮ also gave a statement that on the morning of February 15, 2019, ▮▮▮ said, when prompted, that she remembered saying that she was raped and mentioning ▮▮▮, Plaintiff, and ▮▮▮ the night before, but that she also stated, "Oh my God, I think I was drugged, I don't know what happened last night."

32.      ▮▮▮ advised the police that ▮▮▮ had accused ▮▮▮ the night before and provided the note on which ▮▮▮ had written ▮▮▮'s name.

33.      That same day, ▮▮▮ told her parents that she had been raped.

34.      At approximately 5:30 p.m. on February 15, 2019, Rhodes College published a notice that a sexual assault had been reported on campus.

35.      The MPD came to Rhodes College's campus to question students. Various news organizations obtained footage of the police on Rhodes College's campus and reported the allegations of sexual assault at the SAE house.

36.      Both Plaintiff and ▮▮▮ cooperated in the MPD investigation, promptly providing DNA samples to compare to any sample taken from the rape kit or from ▮▮▮' clothing, which MPD preserved in evidence.

37.      Neither Plaintiff nor ▮▮▮ has been charged with any crime.

38.      The week immediately following the alleged event, an organization called "Culture of Consent" approached all of the fraternities on campus and requested that they cancel all functions for the upcoming weekend while Culture of Consent staged a protest.

39.      This protest was clearly directed at fraternal organizations and the Rhodes College administration and designed to pressure Rhodes College into finding male students responsible for violations of the sexual misconduct policy.

40.     A number of protesters specifically accused Rhodes College of covering up sexual assaults by male students.

41.     On February 20, 2019, Culture of Consent posted the following to its Facebook page:

> HEY IFC!
> For decades you have branded yourselves as gentlemen, model members of society that every young man on campus should aspire to be. You have failed miserably to live up to those lofty ideals. You espouse sentiments of brotherhood, of service; however, time and time again you have shown that you put your own trivial interests above all else, including human decency and public safety.
>
> THE SUBJECT OF IKE SLOAS' EMAILS THIS SEMESTER COULD HAVE BEEN PREVENTED. Your refusal to take responsibility for the continued sexual violence perpetrated by your members is unacceptable. We know there are men among you who stand against the history of violence perpetuated by your organizations, and it's time for you to stand up for your values, lest you be counted among the apathetic masses who fail to take action.
>
> DID YOU KNOW….There are rules within individual fraternities set in place to prevent sexual assault and keep members of the Rhodes community safe. The problem is they are not being followed. The culpability falls on those who have power and refuse to implement these measures to protect the student body.
>
> OUR DEMANDS
> 1. HOLD YOURSELVES ACCOUNTABLE: Hold individual members who have perpetrated sexual misconduct accountable for their actions through immediate suspension of membership and eventual expulsion. Don't wait for Title IX and survivors to hold them accountable. Be the ones to take initiative and ownership over the actions and behavior of your members.
> 2. MANDATE TRAINING: Each of you have programming initiatives for both prospective members and active members. This must include training on bystander intervention and sexual assault prevention and must be mandatory for ALL members.
> 3. USE YOUR VOICE: Call out and condemn acts of sexual violence in our community, even if your leadership won't. Show your support for survivors, and stop waiting for others to speak for you. #AskForBetter
>
> TO THOSE OF YOU NOT IN A FRATERNITY….if you continue to support those organizations who refuse to reform and refuse to make our campus a safer place, you are complicit. Do not attend fraternity functions until they make it clear that they will meet these demands.

> This is a chance for Rhodes to grow and improve as a community. It is a chance for Rhodes' Greek life to be an example instead of the problem. It is a chance for Rhodes to be a place where we all feel safe. Do better, Rhodes.

42.     The members of IFC and Rhodes College's fraternities are, by definition, exclusively male.

43.     Culture of Consent focused their protest against male students only, not against perpetrators of sexual violence generally.

44.     On February 21, 2019, Rhodes College President Marjorie Hass sent an email to all students and employees of Rhodes College in response to the foregoing allegations made against Plaintiff and ▮ stating:

> We will not tolerate sexual assault in our community.
>
> Last Friday you received a community notification informing you that the Memphis Police Department was investigating a sexual assault. We are offering them full cooperation and assistance. This matter is also being investigated through our own Title IX office.
>
> As has been reported, the police investigation included a search of the SAE house. As soon as we were notified of this, we informed the chapter that they were to cease and desist from all activities.
>
> I have heard many voices speaking out today with anger and a firm commitment to building a strong culture of consent. We must all work towards this together.
>
> My heart goes out to all those who have experienced sexual assault. I admire the strength of survivors who report their assaults and seek justice. And I understand the complex reasons why this crime often goes unreported.

45.     This email was received by staff and faculty members who would later serve as adjudicators of the Title IX Complaint against Plaintiff and ▮

46.     On February 22, 2019, Culture of Consent hosted and participated in a silent vigil regarding sexual assault on campus in direct response to the allegations made by ▮.  Rhodes College President Marjorie Hass attended this vigil.  She then forwarded her February 21, 2019

email along with a message about joining in solidarity with those at the vigil to the parents of all students.

47. ████ did not, at any point, initiate a Title IX complaint to the school.

48. Following the notification by the MPD that they were pursuing an investigation into the events of February 14-15, Rhodes initiated its own Title IX investigation for violations of its sexual misconduct policy.

49. When Rhodes College's investigator, Emma Davis, an attorney with Baker Donelson, interviewed ████, she stated that she recalled ████ being present while the rape was happening.

50. Rhodes College's investigator interviewed fourteen witnesses (both male and female) excluding the accused and ████ Not one witness corroborated that ████ had been raped or that she had even been left in a position to be raped.  In fact, based on the notes taken by the investigator, it does not appear that any witnesses who were actually present at the SAE house outside of ████ were even asked if any inappropriate sexual activity had taken place.  The only evidence that ████ had been raped were ████'s statements made to ████ and ████ while incapacitated and intoxicated.

51. During the course of Rhodes' investigation, the investigator interviewed ████ Despite clear allegations being made by ████ and ████ about ████.'s involvement in encouraging the alleged incident, the Rhodes investigator did not ask ████ about those allegations.

52. On April 4, 2019, Culture of Consent posted the following to their blog:

> Schools grant their star football players a special leniency regarding sexual assault, and it keeps me up at night.
>
> So why are these men not held accountable? Why are star football players, men who not only little boys, but also little girls, look up to as role models, not punished for committing something so serious as sexual assault?

This is male football player privilege.

Every day I watch football players walk around a Division Three school like they own the place. Before home football games, the men at Rhodes College dress up in suits, parade across campus, walk to their promised land, to our promised land: the football field. We treat football players like kings.

53.     Accordingly, Culture of Consent again directed its pressure on Rhodes' administration exclusively at male students, not against perpetrators of sexual assault.

54.     Both Plaintiff and ▇ were football players, and this post was made just three days after the Title IX investigation was completed and just thirteen days prior to the disciplinary hearing for Plaintiff and ▇

55.     On information and belief, Rhodes College rarely, if ever, independently initiates Title IX complaints against female students but does independently initiate complaints against male students.

56.     On April 5th, 2019, Rhodes College charged Plaintiff and ▇. with violations of its sexual misconduct policy.

57.     On or about April 17, 2019, Rhodes held a hearing on whether ▇ and Plaintiff had violated the sexual misconduct policy.

58.     At the hearing, Plaintiff and ▇ appeared and denied any wrongdoing.

59.     The alleged victim, ▇ did not attend or participate in the hearing at all. She was not subject to any questioning by the decision panel or subject to cross-examination of any kind whatsoever.  The only testimony from ▇ came as a result of hearsay from the investigator, who she told that she "remembers both [Plaintiff] and ▇. being upstairs along with other guys and ▇ and "thinks" Plaintiff, ▇. and even another male "could have" perpetrated the act in question. ▇'s friends also were permitted to offer hearsay testimony in lieu of ▇ actual testimony.

60.     Despite ███ ' decision not to participate in the Title IX disciplinary proceeding, she did send her attorney, Attorney Robert Hale. He was not permitted to participate, but he was permitted to sit in the hearing. Throughout the hearing, Attorney Hale held a file that said "███ v. SAE" on the outside, visible to the entire panel and everyone else present at the hearing.

61.     Despite Rhodes College's policy that they have discretion to admit anyone they deem appropriate to the Title IX hearing, the attendance of an attorney for a non-participant who did not initiate the Title IX proceeding violates the confidentiality requirements of FERPA and Title IX.

62.     Not one single witness during the proceeding testified in a manner that supported ███'s contention through any form of direct evidence.

63.     In fact, every witness who was present at the SAE party testified that they were regularly in the presence of ███ and that nothing happened.

64.     ███, the female student that ███ accused of being the instigator of and a participant in her alleged rape, testified at the hearing. The Title IX panel did not ask ███ a single question about her alleged involvement in the alleged incident.

65.     The only testimony that related to Plaintiff's and ███'s conduct towards ███ was that they attempted to help ███ and that they contacted her friends to come and pick her up.

66.     No testimony placed Plaintiff and ███ alone with ███. together at any time. No testimony placed Plaintiff alone with ███.

67.     Without having provided Plaintiff or ███. any warning, the Title IX coordinator, Tiffany Cox, introduced additional "evidence" into the record at this proceeding. Faced with no actual evidence on which to base a finding of responsibility, Cox introduced one page of a medical

examination indicating that ███ had superficial injuries to her rectum. The panel was asked to take

this as dispositive of the allegation that ███ had actually been raped.

68.     The panel questioned Plaintiff and ███ about the content of this medical record,

asking them to speculate on the cause of the injuries. They could not do so and did not have an

opportunity to consult with a medical professional or present testimony as to that issue.

69.     The superficial injuries described in the report are consistent with many possible

causes. For example, the injuries could be caused by hard stool or other gastro-intestinal disorders

and consensual anal penetration. Because ███ was not present, she could not be asked about these

possible causes.

70.     Rhodes College selectively enforced its Title IX policy by charging only Plaintiff

and ███, the males accused, with a violation of its sexual misconduct policy.

71.     ███ is a student at Rhodes College and is therefore subject to the Rhode College

Title IX policy. The allegations made against ███., which were verbal in nature as opposed to

hand gestures, were at least as likely to implicate ███. in sexual misconduct as defined under

Rhodes College's Title IX policy as the "allegations" made against Plaintiff and ███.

72.     Rhodes College's Title IX policy, for example, prohibits the following conduct:

a.  *Sexual Misconduct:* Is a broad term that encompasses sexually-motivated
    misconduct as described in this policy, including conduct of an unwelcome
    and/or criminal nature, whether such conduct occurs between strangers,
    acquaintances, or intimate partners. For the purposes of this policy, the
    following terms are collectively referred to as "Sexual Misconduct" and will
    be defined in detail below: Dating Violence, Domestic Violence,
    Nonconsensual Sexual Contact, Nonconsensual Sexual Penetration, Sexual
    Assault, Sexual Exploitation, Sexual Harassment, Sexual Violence, and
    Stalking;

b.  Engaging in unlawful conduct based on one's gender, sexual orientation,
    gender identity or expression, including, but not limited to, acts of verbal,
    nonverbal, or physical aggression, intimidation, or hostility based on

sex/gender or sex/gender-stereotyping, even if the acts do not involve conduct of a sexual nature;

c.  Making unwelcome sexual advances, propositions or other sexual or gender-based comments, such as sexual or gender-oriented gestures, sounds, remarks, jokes or comments about an individual's gender, sex, sexuality or sexual experiences;

d.  Requesting sexual favors, or engaging in other verbal or physical conduct of a sexual nature;

e.  Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, or suggestive or obscene letters, notes, drawings, pictures or invitations, or through digital media;

f.  Exceeding the boundaries of consent (such as, permitting others to hide in a closet and observe consensual sexual activity, videotaping of a person using a bathroom or engaging in other private activities);

g.  Engaging in voyeurism, exposing one's breasts, buttocks, or genitals in a non-consensual circumstance or inducing another to expose their breasts, buttocks, or genitals without affirmative consent.

73.    In addition to the fact that ███ would necessarily have violated the above seven provisions of Rhodes College's Title IX policy, if ███' allegations against ███ were true, ███. has never stated clearly *who* she alleges raped her. She stated that she could not recall who actually raped her, but she did specifically recall ███'s presence. ███. also never stated whether she was penetrated by an individual with a body part or an object. If the presence of Plaintiff and ███. is sufficient evidence to determine that they have violated the Title IX policy, then ███'s presence should implicate her equally.

74.    Rhodes College ultimately charged Plaintiff and ███ with Non-Consensual Sexual Penetration. Rhodes College's Title IX policy defines "sexual penetration" "as sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of any other

person's body." Rhodes College has never articulated a basis for its assertion that Plaintiff and ▮. violated this policy, but not ▮▮, whom Plaintiff accused of involvement by name. The most reasonable explanation for this is that Rhodes College did not consider the possibility that a female student penetrated another female student within the meaning of this definition, but instead assumed that only a male student would or could do so.

75.     Despite the much more substantial allegations against ▮▮, a female student who ▮▮ more clearly accused of sexual misconduct, Rhodes College elected to charge only male students.

76.     No reasonable person could find, based on the absolute dearth of direct evidence against Plaintiff and ▮▮, that they sexually assaulted ▮▮.  In fact, absent the recovery of semen or other DNA evidence from ▮▮' rape kit, no reasonable person could, by a preponderance of the evidence, determine that she had, in fact, been raped. Her position on whether the rape actually occurred has evolved substantially since the day following the rape. She has gone from possibly "misremembering" the events to stating that she was sexually assaulted, but she has been totally unable to identify the alleged perpetrator(s). The evidence linking Plaintiff or ▮▮. to the alleged rape is a "thumbs up" when asked a leading question by her roommate while intoxicated to the point that she could not speak.

77.     The only individual that ▮▮. verbally accused of involvement in the alleged sexual assault was ▮▮., a female student. Rhodes College's decision not to so much as inquire into ▮▮'s alleged involvement had the obvious effect of rendering the Title IX process fundamentally flawed and is facially discriminatory.

78.    Despite this total dearth of evidence against Plaintiff and ██, the hearing panel found that both of them were responsible for sexual misconduct by a preponderance of the evidence, and both were expelled from Rhodes College.

79.    As a result of Rhodes College' expulsion, which was the direct result of gender bias, Plaintiff will not be able to finish his course work and will not graduate by December 2019.

80.    Further, the expulsion will make Plaintiff's enrollment at any other institution of similar or equal prestige to Rhodes College for completion of his undergraduate requirements unlikely.   The expulsion has caused damage to Plaintiff's reputation that will follow him throughout his professional and educational careers as well as caused emotional distress.

81.    Plaintiff alleges that Rhodes College and the individual staff/faculty hearing the Title IX charges, under pressure from the media, Culture of Consent, ██'s tort attorney, and President Hass, intentionally singled out two male students against whom to prosecute a spurious allegation of sexual assault based on virtually no evidence while simultaneously electing not to pursue a more fully-articulated (though still questionable) claim of violating the sexual misconduct policy against a female student.

## CAUSES OF ACTION

### Count 1 - Denial of Equal Access to Education on the Basis of Gender in Violation of 20. U.S.C. § 1681 (Title IX) – Erroneous Outcome

82.    Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

83.    The acts and failures to act, perpetrated against Plaintiff amounted to discrimination on the basis of gender.

84.    Specifically, Plaintiff avers that the facts set forth above, including but not limited to the failure to require the participation of ██ in the Title IX hearing or to permit any form of

cross-examination of ■ and the introduction of last-minute evidence not previously presented to Plaintiff, cast articulable doubt on the outcome of the proceedings.

85.    Plaintiff avers that the erroneous outcome of the proceedings was motivated by gender bias in that the failure to charge ■. with a violation of the sexual misconduct policy demonstrates a specific desire to initiate disciplinary proceedings for sexual misconduct against male students but not against female students.

86.    In addition, Plaintiff avers that the erroneous outcome of the proceedings was motivated by gender bias in that the failure to charge ■., a decision that can only be reasonably linked to Plaintiff and ■.'s genders, both substantially and materially impacted the outcome of the proceedings.

87.    Additionally, and in the alternative, Rhodes College was under outside pressure to hold male students accountable for sexual assault. Specifically, the Culture of Consent protest on Rhodes College's campus as well as social media posts, directed specifically at fraternal organizations and the administration, President Hass's emails and actions in solidarity with the aims of Culture of Consent and taken in response to the allegations against Plaintiff, along with the attendance at the Title IX hearing of Attorney Robert Hale, who is, on information and belief, developing a lawsuit against the SAE fraternity, demonstrates that Rhodes College was under substantial outside pressure to reach an outcome that was adverse to fraternity members, who are by definition, universally male. Rhodes College was also under pressure from Culture of Consent to hold male football players responsible for sexual misconduct violations.

88.    Additionally, and in the alternative, on information and belief, Rhodes College has a pattern or practice of independently bringing sexual misconduct cases against male students substantially more often than against female students. On information and belief, while Rhodes

College frequently independently initiates Title IX/sexual misconduct investigations into male students based on third-party complaints or information that comes to its attention without a complaint by the alleged victim, it rarely does so to female students. This pattern or practice constitutes gender discrimination that led to the erroneous outcome of the student discipline proceeding against Plaintiff.

89.     Plaintiff has and will continue to incur attorney fees and costs of litigation.

### Count 2 - Denial of Equal Access to Education on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX) – Selective Enforcement

90.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

91.     The acts and failures to act, perpetrated against Plaintiff amounted to discrimination on the basis of gender.

92.     Plaintiff avers that gender bias motivated Rhodes College to charge Plaintiff and ██ but not ██. with a violation of the sexual misconduct policy, amounting to selective enforcement of Title IX.

93.     Additionally, and in the alternative, Rhodes College was under outside pressure to hold male students accountable for sexual assault. Specifically, the Culture of Consent protest on Rhodes College's campus as well as social media posts, directed specifically at fraternal organizations and the administration, President Hass's emails and actions in solidarity with the aims of Culture of Consent and taken in response to the allegations against Plaintiff, along with the attendance at the Title IX hearing of Attorney Robert Hale, who is, on information and belief, developing a lawsuit against the SAE fraternity, demonstrates that Rhodes College was under substantial outside pressure to reach an outcome that was adverse to fraternity members, who are by definition, universally male. Rhodes College was also under pressure from Culture of Consent

to hold male football players responsible for sexual misconduct violations.  Rhodes College's capitulation to this pressure amounted to selective enforcement of Title IX

94.     Additionally, and in the alternative, on information and belief, Rhodes College has a pattern or practice of independently bringing sexual misconduct cases against male students substantially more often than against female students. On information and belief, while Rhodes College frequently independently initiates Title IX/sexual misconduct investigations into male students based on third-party complaints or information that comes to its attention without a complaint by the alleged victim, it rarely does so to female students. This pattern or practice amounts to selective enforcement of Title IX.

95.     Plaintiff has and will continue to incur attorney fees and costs of litigation.

**Count 3 – Breach of Contract**

96.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

97.     The Rhodes College Student Handbook and Title IX Policies form a contract between Rhodes College and Plaintiff, setting for the responsibilities and duties of both Rhodes College and the students to each other.

98.     Rhodes College is the drafter of the terms of the contract, and the contract, where ambiguous, should be construed against Rhodes College.

99.     Rhodes College's Title IX Handbook states as follows:

**B. The Formal Resolution Hearing and Determinations of Responsibility**

1. At the Formal Resolution Hearing, the Investigator may give a statement containing a summary of their factual findings, and each party will have the option to provide an introduction and an opening statement, summarizing their position.

2. Each party will be permitted to call their own witnesses. Witnesses will be asked to affirm adherence to the Honor Code. Prospective witnesses, other than the

Claimant and the Respondent, may be excluded from the hearing during the statements of the Investigator and other witnesses. The Sexual Misconduct Hearing Board will not consider information from character witnesses or character testimony.

3. The Board, the Claimant and the Respondent will have an opportunity to question witnesses who appear at the hearing. In other words, any person who offers testimony at the hearing must remain available to answer questions from the Board and both parties. Questions by the Claimant and the Respondent should be directed to the Board Chair, who will facilitate the questioning of all witnesses, including the Investigator. Typically, the Board will ask its own questions first, then the questions of the party whose witness it is, then the questions of the other party. The Board Chair will be responsible for ensuring the questioning is fair and complies with the terms of the Policy, but will not otherwise substantively limit the scope of the parties' questions unless they seek to elicit solely character evidence, irrelevant information, unduly cumulative evidence, or have the effect of impermissibly badgering or harassing the witness. Questions about the parties' sexual history with anyone other than each other are expressly prohibited during the hearing phase, but if the Respondent is found in violation of the Policy, Respondent's past sexual misconduct may be subject to inquiry in connection with determining potential sanctions.

4. The Board may, in its discretion, exclude or grant lesser weight to last-minute information or evidence introduced at the hearing that was not previously presented for investigation by the Investigator.

5. At the conclusion of the hearing, the Investigator may give a closing statement and each party will have an opportunity to provide a closing statement at their option.

6. All parties, the witnesses and the public will be excluded during Board deliberations, which will not be recorded or transcribed.

7. The Title IX Coordinator will be present at the hearing and can assist with procedural matters. However, the Title IX Coordinator will not participate in the deliberations of the Hearing Board in determining responsibility
.
**8. In all cases, the Hearing Board must consider evidence presented by the Claimant, the Respondent, the Investigator and/or others and determine by a preponderance of the evidence whether a violation of the Policy occurred, i.e., whether it is more likely than not that a Respondent violated the Policy, and impose sanctions, if any.**

9. The Hearing Board will notify the Title IX Coordinator of the decision.

        10. Decisions made in a Formal Resolution Hearing may be appealed as described in the Appeal Section below. (emphasis added)

100.    Rhodes College, through its authorized agents and employees, breached its contract with Plaintiff in that the Title IX hearing panel plainly disregarded and failed to consider evidence presented by Plaintiff.

101.    Rhodes College, through its authorized agents and employees, breached its contract with Plaintiff in that the Title IX hearing panel when it ignored its own standard of proof—preponderance of the evidence—and found Plaintiff to have committed sexual misconduct despite a total lack of evidence against him.  No reasonable person acting in good faith could have reached the conclusion that Plaintiff violated the school's sexual misconduct policy.

102.    For example, in finding Plaintiff in violation of the sexual misconduct policy, Rhodes College found that the most influential factors against Plaintiff were "the victim's consistent identification of [Plaintiff] as a person who assaulted her, both on the night of the incident and in subsequent interviews with the investigator, and the corroboration of the victim's account of events that emerged throughout the hearing process."

103.    However, all witnesses with personal, direct knowledge fully exonerated Plaintiff and testified in direct contradiction to the allegations against him and no witness, including the alleged victim, was able to corroborate the sexual misconduct charges against him.  Further, Rhodes College ignored the alleged victim's admissions that she might be "misremembering" what occurred and that her "consistent identification of" Plaintiff consisted of statements that she "thinks" it was Plaintiff but others "could have" perpetrated the act.

104.    As a result of Rhodes College's breach of contract, Plaintiff has suffered damages both actual and consequential and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the following relief be granted:

1.      This Court issue a Preliminary Injunction prohibiting Rhodes College from enforcing its expulsion of Plaintiff and allowing Plaintiff to enroll in and attend classes for the Fall 2019 Semester pending the outcome of this proceeding;

2.      The Court issue a declaratory judgment in favor of Plaintiff finding Rhodes College in violation of Title IX;

3.      This Court issue a permanent injunction prohibiting Rhodes College from enforcing its expulsion of Plaintiff;

4.      This Court issue a permanent mandatory injunction requiring Rhodes College to purge Plaintiff's academic record of any reference to a finding of sexual misconduct;

5.      This Court enter a judgment against Rhodes College in a monetary amount to be established by the Court;

6.      This Court fashion any other appropriate equitable remedy;

7.      This Court award Plaintiff attorney's fees, suit expenses, costs, disbursements, pre-judgment interest, post-judgment interest, and expert witness fees; and

8.      This Court order any further relief to which Plaintiff may prove he is entitled.

Respectfully submitted,

**DONATI LAW, PLLC**

s/Bryce W. Ashby
Donald A. Donati #8633
Bryce W. Ashby #26179
1545 Union Avenue
Memphis, TN 38104
901/278-1004
don@donatilaw.com
bryce@donatilaw.com

Attorneys for Plaintiff